```
                    United States District Court
                      District of Massachusetts
 _____
                                     )
 United States of America,           )
                                     )
         v.                          )   Criminal Action No.
                                     )   22-30007-NMG
 Vicente Gonzalez,                   )
                                     )
         Defendant.                  )
                                     )
 _____
```

**MEMORANDUM & ORDER**

**GORTON, J.**

Defendant Vicente Gonzalez ("Gonzalez" or "defendant"), along with three co-defendants, has been indicted on one count of conspiracy to distribute and to possess with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C § 846, and one count of possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c). The government also brings a drug forfeiture allegation under 21 U.S.C. § 853 and a firearm forfeiture allegation under 18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c).

Pending before the Court is defendant's motion to suppress evidence seized from 55 Earl Street, Springfield, Massachusetts (Docket No. 200) and a motion to suppress evidence obtained from wiretaps of defendant's phone (Docket No. 201). For the reasons that follow, the motions will be denied.

**I.   Background**

The drug trafficking charge against Gonzalez arises from an alleged conspiracy to distribute cocaine and cocaine base from April, 2021, until March, 2022, in Hampden County, Massachusetts.  The firearm charge derives from allegations that defendant possessed a firearm in furtherance of the drug trafficking offense on the day of his arrest, March 10, 2022.

**A. The Investigation**

The Federal Bureau of Investigation ("FBI") Western Massachusetts Gang Task Force initiated an investigation into the so-called Vicente Gonzalez Violent Criminal Enterprise (the "Gonzalez VCE") in April, 2021.  The investigators report that the Gonzalez VCE uses violence and threats of violence to control defendant's drug trafficking territory and to distribute large quantities of narcotics, including cocaine and cocaine base.  The government alleges that Gonzalez is the leader of the criminal organization.

Investigators used physical and electronic surveillance, controlled purchases of drug evidence, phone toll analysis, pen registers, trap and trace devices, consensual monitoring and court-authorized interception of wire and electronic communications during their investigation.

In January, 2022, investigators applied for and were granted a wiretap of multiple cell phones including the purported phone of defendant. Further, in March, 2022, officers applied for a warrant to search 55 Earl Street, First Floor, Springfield, Massachusetts ("the Warrant"). The application was supported by an affidavit of FBI Task Force Officer J. Todd Briggs ("Officer Briggs") and the Warrant was authorized on the same day by Magistrate Judge Katherine A. Robertson.

**B. 55 Earl Street Warrant**

The affidavit supporting the Warrant includes information linking Gonzalez and certain contraband to 55 Earl Street. It avers that investigators regularly observed co-defendant Brigham Ocasio-Ramos ("Ocasio") leave 55 Earl Street in the morning and return in the evening. It also summarizes a phone conversation between Gonzalez and Joseph Dumpson, who is listed as the owner of 55 Earl Street in the Springfield Registry of Deeds, discussing mortgage payments. Investigators concluded that Gonzalez was renting the first floor of 55 Earl Street and subletting the unit to members of the Gonzalez VCE, including Ocasio.

The affidavit also details evidence concerning the purported operations of the Gonzalez VCE. For example, in January, 2022, investigators intercepted a call in which Gonzalez told Ocasio that he instructed a third party to "wait

-3-

for [Ocasio] to get there so [Ocasio] can show [the third party] how it works." Investigators contend that Gonzalez informed Ocasio that the third party would be waiting for Ocasio to arrive at 55 Earl Street and instructed Ocasio to teach the third party how to prepare cocaine while he was there.

At the end of the phone conversation, Gonzalez purportedly instructed Ocasio to take a photograph of "a new 380" when Ocasio returned home because Gonzalez wanted to sell that item to "the old guy." Gonzalez said that he had previously sold the "old guy" a "32" and wanted it back because "people are looking for those guns." Investigators believe the "380" was a firearm and the term "32" was in reference to a .32-caliber firearm. Later that same day, investigators intercepted two text messages from Ocasio to Gonzalez containing photographs of a firearm.

According to the affidavit, investigators intercepted a call on the morning of February 23, 2022, in which Gonzalez instructed Ocasio to continue preparing "the balls," of which Ocasio had "made five," and contact co-defendant Khristy Guzman ("Guzman") to pick them up from his house. Based on context and experience, investigators believe that Gonzalez was referring to five "eight-balls" of cocaine.

Later that afternoon, investigators observed Guzman arrive at 55 Earl Street, enter the back door and leave shortly thereafter. From that conversation and physical observation,

-4-

investigators assert that Ocasio was instructed to transfer the prepared cocaine to Guzman when she arrived at 55 Earl Street.

On the morning of March 4, 2022, investigators intercepted a phone call from Gonzalez to Ocasio in which Gonzalez stated he had "to cook" because he knows "whatever is left will be gone quickly." Investigators suggest that Gonzalez meant that he had to prepare cocaine base. Later that same day, investigators observed Gonzalez arrive at 55 Earl Street and park on the street. He entered the residence carrying a white bag.

## II. Motion to Suppress

### A. Probable Cause

Counsel for defendant contests the nexus element of probable cause. The finding of a magistrate judge as to probable cause is entitled to "great deference," Illinois v. Gates, 462 U.S. 213, 236 (1983), and the decision to issue a search warrant should be reversed only if there is "no substantial basis for concluding that probable cause existed." United States v. Dixon, 787 F.3d 55, 58-59 (1st Cir. 2015) (citation omitted).

Probable cause exists when, based upon common sense and the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238. A warrant application must

demonstrate probable cause to believe that (1) a crime has been committed (the "commission" element) and (2) enumerated evidence of the offense will be found at the place searched (the "nexus" element). United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999).  The nexus element is satisfied when

> the facts presented in the affidavit would 'warrant a man of reasonable caution' to believe that evidence of crime will be found.

United States v. Leonard, 17 F. 4th 218, 228 (1st Cir. 2021) (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)).

Counsel for defendant asserts that 1) Gonzalez does not live at 55 Earl Street, 2) no sales of illicit narcotics took place there and 3) other addresses in the warrant were more likely to be the source of narcotics.  Thus, counsel for defendant insists that the evidence cited in the affidavit is insufficient to connect 55 Earl Street to the presence of contraband.  She relies heavily on the First Circuit Court of Appeals ("First Circuit") decision in United States v. Roman, 942 F.3d 43, 51. (1st Cir. 2019) and the Sixth Circuit Court of Appeals ("Sixth Circuit") decision in United States v. Brown, 828 F.3d 375, 383-84 (6th Cir. 2016).

The government counters that defendant's motion should be denied because 1) defendant has no standing to challenge the search, 2) 55 Earl Street was searched pursuant to a properly issued search warrant and 3) the "good faith exception" applies.

The affidavit sufficiently links the drug enterprise generally and Gonzalez specifically to 55 Earl Street and the subject contraband. It avers that investigators intercepted a call from Gonzalez confirming to a male, later identified through public records to be the owner of 55 Earl Street, that Gonzalez had rented the First Floor. Investigators also regularly observed Ocasio leave 55 Earl Street in the morning and return at night. Evidence detailed in the affidavit sufficiently establishes that Gonzalez rented and used 55 Earl Street and that co-defendant Ocasio lived in the unit.

Averments in the affidavit uncontestably link 55 Earl Street to the operations of the alleged conspiracy and contraband. Numerous details of intercepted phone calls and corroborating circumstances make clear that defendant discussed narcotics processing operations at 55 Earl Street.

For example, the affidavit describes Gonzalez's instructions to Ocasio who, based on physical surveillance, was known to reside at 55 Earl Street, to prepare "the balls" and contact Guzman thereafter. Guzman was observed arriving at 55 Earl Street two hours later and leaving for 298 Elm Street immediately thereafter. Investigators reasonably inferred that "the balls" of which Ocasio had already "five made" referred to cocaine.

Furthermore, as discussed supra, the affidavit contains details of a longstanding drug distribution conspiracy involving Gonzalez and Ocasio and plausibly established that Ocasio resided at 55 Earl Street.  When combined with the direct evidence of recorded phone conversations referring to narcotics, investigators reasonably believed they would find contraband and records linked to the conspiracy at 55 Earl Street. See United States v. Feliz, 182 F.3d 82, 87 (1st Cir. 1999) (crediting the inference that contraband linked to a drug conspiracy would plausibly be found in a drug-dealer's residence).

The affidavit also supported a nexus between 55 Earl Street and the presence of an illegal firearm.  Ocasio sent a text message with a photo of a firearm to Gonzalez after they discussed a "380" and "32," which investigators concluded were types of firearms.  Shortly before that, Gonzalez told Ocasio,

> [w]hen you get to your house later, take a picture and send it to me.  So I can send it to him[.]

Those messages reasonably tie the presence of a firearm to Ocasio's residence at 55 Earl Street.

Defendant's reliance on Roman is inapposite. See 942 F.3d at 51.  There, the First Circuit held that the affidavit supporting a search warrant contained insufficient evidence to tie drug activity directly to the defendant's residence. Id. The only direct evidence detailed in the affidavit did not tie

the searched residence to drug activities. It merely established that defendant got out of a car, which was registered at his residence, at a different location with a "weighted bag." Id. at 50-51. Evidence gathered from a confidential informant did not indicate that he believed defendant conducted drug-related business from or kept drug-related evidence at the residence. Id. at 50.

Investigators in this case did not make such attenuated inferences but rather relied upon specific intercepted phone calls that alluded to narcotics production and the presence of a firearm at 55 Earl Street. Investigators also made multiple direct observations of activity of a co-defendant and known associates in and around the address that corroborate criminal conduct.

The Court need not address the good faith exception because the affidavit presented evidence that provided probable cause for issuance of the search warrant. For the same reason, the Court need not consider whether defendant has standing to challenge the search.

**B. Necessity of the Wiretap**

Finally, defendant moves to suppress the fruits of the wiretaps for telephones associated with the numbers 413-378-9152 ("9152") and 413-275-9200 ("9200"). Defendant asserts that the

application failed the necessity requirement under 18 U.S.C. § 2518(1)(c) because it failed to

> contain a sufficient basis for the Court to conclude that other investigative procedures have been tried and failed, or had not been tried, or why other investigative procedures reasonably appear to be unlikely to succeed if tried, or to be too dangerous

and that use of informants, pen registers and controlled drug purchases was sufficient.

While counsel for defendant refers to a memorandum in support of the motion to suppress evidence from the wiretaps, no such memorandum is on file and she appears to have erroneously filed the memorandum in support of her first motion to suppress twice. Alert to that possibility, the courtroom deputy twice notified counsel of the error nearly two months ago and government's counsel has, for the same reason, moved that defendant's motion be deemed waived. Still, counsel for defendant has yet to file a supporting memorandum.

The Court will, therefore, assess the motion based on the limited context referred to in the cover motion itself. As an initial matter, the affidavit supporting the wiretap attached to the government's memorandum does not appear to seek authorization for a wiretap on the "9152" number but rather, seeks authorization only for the "9200" number (referred to as "TARGET TELEPHONE 2"). The affidavit does not indicate whether there ever was a wiretap on the "9152" number. Accordingly, the

Court will construe defendant's motion to suppress as only addressing the authorization for a wiretap on the "9200" number.

Title III of the Omnibus Crime Control and Safe Streets Act of 1986 ("Title III"), 18 U.S.C. § 2518(1)(c), requires that a wiretap application include

> a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

18 U.S.C. § 2518(1)(c).

Before a court authorizes the interception of wire communications pursuant to Title III, it must enter a finding of necessity. See 18 U.S.C. § 2518; United States v. Santana, 342 F.3d 60, 65 (1st Cir. 2003). To satisfy that requirement the government must make a

> reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls.

United States v. Hoffman, 832 F.2d 1299, 1306-07 (1st Cir. 1987). A reviewing court will uphold a wiretap if the facts in the affidavit are "minimally adequate" to support the determination of the issuing judge that other procedures were unlikely to succeed. United States v. Rose, 802 F.3d 114, 118 (1st Cir. 2015) (quoting United States v. Yeje-Cabrera, 430 F.3d 1, 7 (1st Cir. 2005)).

Here, the affidavit describes numerous investigatory techniques in detail and supplies an adequate basis for concluding that those techniques were insufficient. Those techniques included use of cooperating witnesses, cooperating informants, undercover agents, physical and pole camera surveillance and pen register analysis among others. The affidavit reflects the government's good-faith effort to use less intrusive techniques and sufficiently explains their shortcomings.

For example, the affidavit establishes that a cooperating witness ("CW-1") knew two locations where he or she could complete a transaction. There is no indication, however, that CW-1 was able to surmise the organizational structure of the criminal enterprise or its sources of supply.

In summary, the government explains that, after several months employing the techniques listed above, it still had not determined

> the full identity of all but two conspirators, and the sources and customers of the Gonzalez VCE and location of its proceeds and stashes by-and-large remained a mystery.

The averments in the affidavits easily surpass the threshold of minimal adequacy. The government is not required to demonstrate that less intrusive investigatory methods were "wholly unsuccessful." United States v. Abou-Saada, 785 F.2d 1,

11 (1st Cir. 1986). While investigators made progress in developing facts and evidence of the conspiracy without the wiretap, they provided sufficient reasons for why the wiretaps were ultimately critical to filling gaps in the evidence. The motion to suppress with respect to the wiretap will be denied.

## ORDER

For the foregoing reasons, the motions of defendant, Vicente Gonzalez, to suppress evidence from the search of 55 Earl Street (Docket No. 200) and to suppress evidence from the wiretap of the phone associated with the telephone number 413-275-9200 (Docket No. 201) are **DENIED.**

**So ordered.**

                                                 /s/ Nathaniel M. Gorton
                                                 Nathaniel M. Gorton
                                                 United States District Judge

Dated:  April 11, 2024